THE MICHIGAN STATE BANK *v.* JOHN PECK, JOHN H. PECK, AND EDWARD W. PECK.

*Letter of Credit.*

The defendants and H. W. C. signed and delivered a writing of the following tenor: "C. C. Trowbridge, Esq., President, Detroit, Michigan. R. H. & Co., are author- "ized to value upon us, or either of us, to the amount of $25,000, in such amounts "and on such time as they may require, which will be duly honored, and we hereby "jointly and severally hold ourselves accountable for the acceptance and payment "of such drafts."

*Held*

1. That it might be shown by parol, that the writing was intended for the plaintiffs of whom the said Trowbridge was president.

2. That the writing bound all the signers to the payment of such drafts as might be accepted by either of them.

3. That it was not answered by the acceptance and payment of drafts to the amount of $25,000; but that that it was a standing or continuing guaranty for that amount, the parties themselves having so treated and practically construed it.

4. That it extended to, and provided for the payment of drafts made payable else

where than at the residence of the drawee, which had been accepted generally, and recognized, and were obviously conformable to the expectation of the parties. [See *same plaintiff* v. *Estate of Leavenworth*, post p. 209.]

ASSUMPSIT. The facts in the case were agreed upon as follows. The plaintiffs hold three notes against the defendants for $3,000 each, dated August 15, 1854, due in thirty, forty and fifty days, respectively, after said date, for amount due upon which the plaintiffs are entitled to judgment.

On the 25th day of January, 1854, the defendants, under their firm and style of J. & J. H. Peck & Co, and one H. W. Catlin, executed and sent to Roelofson, Hatch & Co., of Detroit, who delivered the same to the plaintiffs, at the said Detroit, in the state of Michigan, a paper of the following tenor, viz.

*Burlington, Vt.,* Jan. 25, 1854.

C. C. Trowbridge, Esq., President, Detroit, Michigan.

Dear Sir:—Messrs. Roelofson, Hatch & Co., of Detroit, are hereby authorized to value upon us, or either of us, to the amount of twenty-five thousand dollars, in such amounts, and on such time as they may require, which will be duly honored, and we hereby jointly and severally hold ourselves accountable for the acceptance and payment of such drafts.

Yours respectfully,

(Signed)                    J. & J. H. PECK & Co.

H. W. CATLIN.

C. C. Trowbridge, was, and has since been the president of the plaintiffs' bank. The paper was received and accepted by the plaintiffs from Roelofson, Hatch & Co., before the fourth day of March, 1854, and has been held by them ever since.

Upon the credit and faith of this paper, the plaintiffs discounted and paid to said Roelofson, Hatch & Co., at Detroit, relying upon said paper, for each discount, bills of exchange, as follows,

| Date of bills. 1854. | Drawers. | Drawees. | Am't. | Due. 1854. | When paid, if paid at all 1854. |
|---|---|---|---|---|---|
| Mar. 4, | Roelofson, Hatch & Co. | J. & J. H. Pecks & Co. | $5000 | May 7, | May 6. |
| May 2, | " " " | " " " | 5000 | July 5, | July 5. |
| Feb. 11, | " " " | H. W. Catlin, | 2500 | May 14, | May 16. |
| Feb. 25, | " " " | " " | 4500 | May 28, | May 27. |
| Mar. 10, | " " " | " " | 2500 | Ap'l 12, | Ap'l 12. |
| Mar. 10, | " " " | " " | 2500 | Ap'l 27, | Ap'l 27. |
| Mar. 11, | " " " | " " | 3000 | Jun. 14, | Jun. 14. |

$25,000.

Michigan State.Bank *v.* Pecks.

| Date of bills. | Drawers. | | | Drawees. | | Am't. | Due. When paid, if paid at all. |
|---|---|---|---|---|---|---|---|
| 1854. | | | | | | | 1854. |
| May 3, | Roelofson, | Hatch | & Co. | H. W. | Catlin. | $5000 | July 11. |
| May 26, | " | " | " | " | " | 1000 | July 29. |
| June 3, | " | " | " | " | " | 2000 | July 16. |
| June 3, | " | " | " | " | " | 2000 | July 26. |
| June 3, | " | " | " | " | " | 2000 | Aug. 5. |
| June 19, | " | " | " | " | " | 3000 | Aug. 22. |
| June 13, | " | " | " | " | " | 5000 | Aug. 16. |

$20,000 Not paid.

all of which bills, except the seven last mentioned, were duly paid, as stated, and said seven bills last mentioned have never been paid, and have ever been held by the plaintiffs.    These seven bills were all duly accepted by Catlin, and duly protested for non-payment, and notice thereof was duly given to all the parties.

On the 15th of August, 1854, the first five of said seven bills being overdue, the plaintiffs applied to Catlin and the defendants for payment, according to said paper ; and the said Catlin, and the defendants, then and there, in order to secure the payment of said overdue bills, executed and delivered to ·the plaintiffs their four promissory notes of an amount equal to said overdue bills, as collateral security ; which notes are still held by the plaintiffs, and are unpaid ; and the defendants were then informed by the plaintiffs that said two other bills of exchange, last mentioned, had been drawn by said Roelofson, Hatch & Co., under said paper, and had been discounted and were held by the plaintiffs.

After said two bills fell due and were dishonored, and in the latter part of September, 1854, the plaintiffs, by their attorney, applied to J. H. Peck, the partner in the defendants' firm having the principal management of the financial affairs of the defendants, for payment of the two bills last mentioned, amounting to eight thousand dollars, and interest, under, and according to said paper, whereupon the said J. H. Peck promised said attorney, that the same should ·be paid, and the whole twenty thousand dollars of said dishonored bills  retired within ten days or two weeks thereafter.

Upon the foregoing case stated, the county court, November Term, 1855,—PECK, J., presiding,—rendered judgment for the plaintiffs to recover $9,743.75, being the amount due on said three promissory notes.

Exceptions by the plaintiffs.

*Geo. F. Edmunds* for the plaintiffs.

From the situation and business of the parties, and the circumstances attending the transactions,—all of which are admissible to aid in the construction of a contract—it is evident that a running line of discounts, not exceeding in amount twenty-five thousand dollars, was intended to be obtained on the faith of this contract. The contract itself looked wholly to the future, and to such sums and time as the necessities of the business should require, and, upon its face, fully warranted this construction.

The limitation is a limit of responsibility, and not a limit of the total sum of .the bills to be drawn. The twenty-five thousand dollars is a standing credit, and up to that amount the' parties are authorized to draw, from time to time, *ad libitum ;* and drafts thus drawn, the defendants promised to pay. 7 Pet. 113, *Douglas* v. *Reynolds.* 12 East 227, *Mason* v. *Pritchard.* 7 Greenleaf 115, *Tuckerman* v. *French.* 1 Met. 24, *Bent.* v. *Hartshorn.* 6 M. & W., *Mayer* v. *Isaac.* 2 Gibbs 504, *Farmers & Mechanics' Bank* v. *Kercheval.*

A transposition of the words of the contract relieves it from doubt; thus—" R., H & Co. are hereby authorized to value on us, or either of us, in such amounts, and on such time, as they may require, to the amount of twenty-five thousand dollars," &c. In commercial contracts, drawn by commercial men, language could scarcely be clearer, to indicate a continuous liability.

Again, the expression " *to* the amount of twenty-five thousand dollars," instead of *for* the amount, clearly shows that amount to have been named as the limit of a continuing liability, rather than as a specific sum for which the bills were to be drawn.

The acts of the parties, having full knowledge of the facts, are decisive in support of the construction we claim. The intention of the parties, is, in all contracts, especially commercial ones, the pole-star of construction ; and in ascertaining that intention, courts always hold them to their own construction of their obligations. 16 Vt. 95, *Austin* v. *Wheeler.*

That such facts are proper, and often essential aids in arriving at the true intent of the parties, in cases of doubt, has been so often declared by the tribunals of all countries, that authorities need scarcely be referred to. *Bell* v. *Bruen ; Lawrence* v. *McCal-*

*mont*, 2 How. 426 ; 22 Vt. 160, *Lowry* v. *Adams ;* are a few of the many cases which support this position.

The acts of the defendants were a full and complete ratification of the authority assumed, (rightfully we think,) by Roelofson, Hatch & Co., in drawing these bills under this contract.

To the objection that the bills are not of the description mentioned in the contract, in that they are made payable in New York, we reply :

1. The acts of the parties, as upon the other point, have given the contract a practical construction, pointing to New York as a place of payment.

2. There is no limitation in the contract itself ; it is a general authority to draw ; and, under such an authority, it rests with the defendants to show that the place of payment was not usual in the course of business, and such as the parties could not have contemplated.    15 Conn. 475, *Bridgeport* v. *Housatonic R. Co.*

3. It is an inseperable incident to the right to draw, that the drawer, ( unless special provision is made,) may appoint the place of payment.    In *Edmonston* v. *Drake,* a place of payment was agreed upon.    In *Launusse* v. *Barker,* the direction was to draw on Tabor & Son, Portland.    The court say that this was a specific direction to draw upon Portland, and must of course be followed.    But in the present case, the contract is silent as to the place where the bill should be payable, and purposely so, no doubt, in order that the parties might draw upon the various markets in which their funds might be received in the course of their trade.

" Had such been the intention, it is but reasonable to suppose that the *limitation* would have been *expressed* in the contract ;" *Lyman* v. *Sherwood,* 20 Vt. 42.    See, too, 2 C. & J. 11, *Thompson* v. *Manley.*

The promise to pay was a waiver of any such objection, and a ratification of the act of Roelofson, Hatch & Co. in drawing these bills under the contract.

*J. Maeck and S. Wires* for the defendants.

I. Plaintiffs have no right to sue upon this guaranty, it not being a general guaranty or letter of credit, authorizing any person to discount on the faith of it, but addressed to a particular individual by name ; *Walton* v. *Dodson,* 14 E. C. L. 250 ; *Grant* v. *Naylor,*

2 Cond. 95 ; *Hall* v. *Rand,* 8 Conn. 574 ; *Walsh & Beekman* v. *Bailie,* 10 Johns. 180.

II. If it is to be treated as a general letter of credit, authorizing any person to whom it is shown to discount bills drawn by R. H. & Co., on the faith of it, then only such of the signers to it as the bill is drawn upon, are bound to accept and pay the same.   See *Coolidge* v. *Payson, Lawrason* v. *Mason,* and the notes to those cases, 2 Am. Lead. Cases from p. 197 to 232.

III. The guaranty or letter of credit, limiting the right to draw, in all, to the amount of $ 25,000, and that amount having been drawn and paid, the instrument became *functus officio ; Boville* v. *Turner,* 18 E. C. L. R. 308 ; *Melville* v. *Hogden,* 5 E. C. L. R. 389 ; *Kirby* v. *Marlborough,* 2 M. & S. 18 ; *Kay* v. *Groves,* 19 E. C. L. R. 82 ; *Rogers* v. *Hamer,* 8 Johns. 92 ; *Douglass* v. *Reynolds,* 7 Peters 113 ; *Hall* v. *Rand,* 8 Conn. 560 ; *Cremer* v. *Higgingson,* 1 Mason, 323 ; *Russell* v. *Perkins,* 1 Mason, 368.

This case is wholly distinguishable from all the cases which have been held continuing guaranties.   In those cases it will be seen that the guaranty contemplates an indefinite amount of dealings, and the guarantor becomes responsible either for the whole balance which may be due, or for a definite amount of that balance.   Such are the cases of *Merle* v. *Wells,* 2 Camp. 413 ; *Mason* v. *Pritchard,* 2 Camp. 436 ; S. C. 12 East. 227 ; *Douglass* v. *Reynolds,* 7 Peters 113 ; *Mayer* v. *Isaac,* 6 M. & W. 605 ; *Ropelye* v. *Bailey,* 5 Conn. 149 ; *Allen* v. *Keating,* 23 E. C. L. R. 401.

IV. The drafts are not drawn in pursuance of any authority conferred.   The defendants living here, the drafts should have been made payable here ; *Lanusee* v. *Barker,* 4 Peters 214 ; *Edmonson* v. *Drake,* 5 Peters 624.

The opinion of the court was delivered, at the circuit session in September, 1856, by

REDFIELD, CH. J.   This is an action by which the plaintiffs seek to recover of the defendants, the amount of certain acceptances of H. W. Catlin, upon a guaranty signed by Catlin and themselves, and addressed to C. C. Trowbridge, President, Detroit, Michigan, in these words, " Dear Sir—Messrs. Roelofson, Hatch & Co., of Detroit, are hereby authorized to value upon us, or either of us to the amount of $25,000, in such amount and on such time,

as they may require, which will be duly honored, and we hereby jointly and severally hold ourselves accountable for the acceptance and payment of such drafts," signed by the defendants, and by Catlin.

The person to whom this letter was addressed, was, at the time, president of the plaintiffs' bank. The letter was given to the hands of Roelofson, Hatch & Co., and by them delivered to the plaintiffs, who, upon its credit, discounted the paper in question.

I. The first question made in the case is, that the guaranty does not appear, upon its face, to be intended for the plaintiffs, and that it is not competent to show that such was the intention of the signers, by extraneous evidence. But contracts of this kind have never been held subject to the same rules of construction, in this respect, as negotiable paper. And in regard to such paper, even in this state, it has been decided that it may be sued in the name of the real party to the contract, although his name does not appear upon the note or bill ; but the general rule of the commercial law is undoubtedly otherwise.

But in regard to a guaranty of this kind, it follows the general rule of the law in regard to simple contracts, which is, that they may be sued either in the name of the nominal, or of the real party. And in the case of oral contracts, it has been considered, that it is not important whether the agency of the promissee were known to the promissor, at the time of entering into the contract. And perhaps the rule may be equally applicable to written simple contracts. At all events, there can be no question that where the agency or trust appears upon the face of the contract, thus indicating an abbreviation or imperfection, so to speak, being, as it were, a call for proof aliunde, that such proof may be introduced as .the basis of giving effect to the contract, by showing the sense in which the terms are used. And, in the present case, the letter of credit being addressed to the person as president, and the proof showing him president of the plaintiffs' bank, and of no other institution, it renders it certain that it was intended for the plaintiffs' benefit. If any doubt had arisen upon the proof upon this point, as if he had been president of two banks at Detroit, such doubt might perhaps, properly enough have been solved by further proof upon the point, as to which particular bank the letter

was in fact addressed. But no such question arises here. The case of *Walton* v. *Dodson*, 3 C. & P. 162, so far as it can be regarded as any authority, being a mere *nisi prius* case, is certainly in favor of the views we take. A guaranty addressed to one partner, was allowed to enure to the benefit of both, upon the ground that they had acted upon the faith of it, and that it obviously was intended for both. So, too, in this case, a general guaranty, addressed to no one in particular, was allowed to enure to the plaintiff's use ; GASDEE, J., saying, " Such a guaranty will enure to the benefit of those to whom, or for whose use it is delivered." The other cases cited do not seem applicable. The case of *Grant* v. *Naylor*, 4 Cranch 224, was where the guaranty was, on the face of it, by mistake, probably, addressed to some other persons than the plaintiffs, and the court held that this mistake could not be set right in a court of law, by oral proof of the intention of the guarantors to address their letter of credit to the plaintiffs. This is in conformity to the long-established rule of law upon the subject. The case of *Hall* v. *Rand*, 8 Conn. 560, 574, does not seem to have any application to this subject. HOSMER, CH. J., there argues against the admission of oral proof as the basis of construction of the written contract, upon the ground that there is no necessity for any such resort, the contract being explicit upon its face, and the proof being offered to give an operation beyond, and inconsistent with its terms. And the case of *Walsh* v. *Bailie*, 10 Johns. 180, is where the guaranty was attempted to be applied to transactions altogether one side of its scope.

II. The question whether the guaranty was intended to bind the signers to the payment of drafts and acceptances to which they were not parties, in form, is one of some nicety, and, upon the terms used, not free from difficulty. But, it seems to us that to give effect to all the terms used, which is ordinarily to be done when it can be, we must conclude that something more was intended than an agreement to accept such bills as were drawn upon both, or either of them, and pay such as they had themselves accepted. If this had been all which was intended, it is scarcely supposable that business men, such as those concerned seem to have been, or, indeed, that any one, should have resorted to so much unnecessary verbiage. The last clause of the guaranty

evidently goes beyond the mere acceptance and payment of such drafts as were addressed to the parties signing; else why stipulate for payment, since the acceptances by themselves bound them to pay. It is obvious that this portion of the contract was intended to bind both signers to the payment of all acceptances made by either. And the conduct of both parties shows very fully that they so understood the contract, else the bills would probably have been drawn jointly, so as to secure the responsibility of both; and, if not so drawn, and the defendants did not expect to be responsible for the acceptances of Catlin, it is altogether incomprehensible that they should, upon the first application, without objection, have executed their notes for $12,000 of such acceptances.

III. The question whether this was intended to be a continuing or standing guaranty, to the amount of $25,000, if it were not that the parties have so treated it, would certainly be attended with difficulty. The terms used would certainly more naturally incline me to regard it as a single guaranty for $25,000, and there to end. The provision, in allowing Roelofson, Hatch & Co. to draw for such amounts, and on such time as they might require, seems to me entirely consistent with that view. It is simply saying, it need not all be in one draft. But when we find the plaintiffs acting upon it as a continuing guaranty, and the defendants assuming the drafts, without objection, it is impossible to doubt that it was so intended by all the parties. And, as the terms used are altogether consistent with such construction, we think the practical construction given it by the parties must be held binding upon them. It would be strange if it were not so, under the circumstances. After the defendants had given their notes for $12,000, and one of the partners and their cashier had given the fullest assurance that the remainder should be provided for in ten days, without any query or claim of exemption, and the plaintiffs had thus been quieted by such a practical construction of their guaranty, it would be little less than a fraud to allow the defendants to now stand upon the strict and literal construction of the letter. We have found no case where the parties have been allowed to repudiate any such long standing and unequivocal practical construction of their contract. And we are so fully persuaded that it could not fail to be of evil example to allow any such thing, in courts of justice, that

we shall be slow to adopt any such conclusion without precedent. *Douglass* v. *Reynolds,* 7 Peters 113, is a full authority for allowing the practical construction of this contract to define the extent of the terms used.

IV. If it be true that, upon the face of this letter of credit, the drafts were naturally to be made payable at the counting-house of the drawees, which is certainly the common course of business, it is what the parties themselves might surely waive, or they might, in the acceptance, limit the place of payment if they chose so to do. But, having made a general acceptance of the bills, and then executed their notes for $12,000, and given assurance of paying the remainder in ten days, it would certainly now be a remarkable defense to prevail, that the bills were made payable in New York. In practice, it is, I think, not uncommon, where paper is negotiated through banks to assist merchants in making extensive country purchases of produce, to remit funds to the cities where such purchases become available, and where the banks often require most of their funds, which may explain the present case consistently with the understanding of all concerned. The conduct of the parties shows very clearly that the bills were drawn in conformity to the expectation of the parties, and that is such a practical construction of the meaning of the contract as will bind the defendants, the same as if they had accepted these very bills.

Judgment for the sum due.